## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _1 : 19- mJ- 02496 - Becerra_

**UNITED STATES OF AMERICA**

v.

**SERGEI NKORINA,**
                **Defendant.**
_____/

### CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?      ___ Yes  ✓ No

2.  Did this matter originate from a matter pending in the Northern Region of the United States
    Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes  ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:  _____

LISA H. MILLER
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5502054
99 N.E. 4th Street
Miami, Florida 33132
Tel:        305-961-9312
Fax:
Email:    lisa.miller@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.  1:19-mJ-02496-Becerra |
| SERGEI NKORINA, | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 14, 2019 _____ in the county of ___ Miami-Dade and Broward ___ in the

___ Southern ___ District of _____ Florida _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1201(a), 1201(c), and 924 (c) | Kidnapping; Conspiracy to Commit Kidnapping; Using/Carrying a Firearm in furtherance of a Crime of Violence |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent James Kelley, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____ 04/03/2019 ____

_____
*Judge's signature*

City and state: _____ Miami, Florida _____

Hon. Jacqueline Becerra, U.S. Magistrate Judge
*Printed name and title*

## SEALED AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Special Agent James Kelley, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since January 2016.  I am currently assigned to the FBI Miami Field Office Violent Crimes and Fugitive Task Force, which targets individuals involved in violent criminal activity and evasion of law enforcement.  As part of my duties, I investigate a variety of violations of federal laws, including kidnapping, bank robberies, Hobbs Act robberies, and other violations of federal law.  I received training on the proper investigative techniques for these violations, including the application and execution of arrest and search warrants.  My experience as a federal law enforcement agent has included execution of arrests and search warrants.

2.      I submit this Affidavit based upon information known to me personally from the investigation, as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein.  This Affidavit is being submitted for the limited purpose of establishing probable cause to obtain an arrest warrant.  Therefore, it does not contain all the information that I am aware of regarding this investigation; however, no information which would negate probable cause for this warrant has been withheld.

3.      Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that SERGEI NKORINA ("NKORINA") committed violations of 18 U.S.C. § 1201(a) (kidnapping); 18 U.S.C. § 1201(c) (conspiracy to commit kidnapping); and 18 U.S.C. §924(c) (using/carrying a firearm in furtherance of a crime of violence).

## FACTS ESTABLISHING PROBABLE CAUSE

### Kidnapping, Torture and Attempted Robbery

4.       On or about January 15, 2019, at approximately 3:45 a.m., police responded to a continuously honking car horn in the parking lot of a commercial establishment located in Broward County in the Southern District of Florida.   Upon responding, police discovered a person (hereinafter, "Victim") in the front seat with his/her hands and feet bound.  The responding officers noted that Victim had burns on his/her hands and lacerations on his/her face.

5.       Law enforcement later interviewed Victim on multiple occasions.  Victim advised that he/she is a plastic surgeon in Broward County.  Victim further advised that on or about January 14, 2019, at approximately 6:45 p.m., Victim was shopping at a Broward County retail establishment, and attempted to enter his/her vehicle upon exiting the store.  Victim advised that a man, armed with a firearm, approached him/her and forced him/her into a waiting van, blindfolded him/her, and bound his/her hands and feet.  Victim advised that there were multiple abductors based on conversations that Victim heard in the van.  Victim stated that his/her captors repeatedly used a taser to shock him/her.  Victim advised that he/she was in the moving van for approximately one hour before it parked.

6.       Victim stated that his/her captors moved him/her inside a small room in an unknown location and placed him/her into a rolling chair.  Victim stated that his/her captors bound his/her hands to the chair's armrest.  The captors removed Victim's blindfold and he/she saw several sharp devices and guns.  Victim's captors showed him/her several documents with his/her personal identifying information on it and then threatened to kill Victim if he/she did not give the captors money.  According to Victim, his/her captors struck him/her and used a blowtorch to burn the top of his/her hands.  Victim stated that they also burned his/her hands with a hot metal object.

2

7.      Victim advised law enforcement that he/she told his/her captors that Victim was willing to give them whatever they wanted, but they just kept hitting him/her and burning his/her hands.  Victim said that his/her captors also asked if he/she had money that they could get access to that night.  Victim provided them his/her home address in Miami-Dade County, Florida, the gate entry information, and the alarm code to the house.  Victim also gave them instructions on where they could find approximately $50,000 inside of his/her house.

8.      Victim could not clearly see his/her captors because they were wearing headlamps and baseball caps.  According to Victim, there were two males present.

9.      After Victim provided the aforementioned information, his/her captors forced him/her to drink alcohol against his/her will.  Victim stated that the captors then put him/her back into the van, and he/she passed out.  Victim advised that he/she awoke back inside of his/her personal vehicle, which was now parked at the commercial location mentioned in Paragraph 4, and where police found Victim.

## The Investigation

10.     Law enforcement obtained and viewed video surveillance from the retail establishment mentioned in Paragraph 5 and from where the kidnappers abducted Victim.  The video shows Victim parking in the store's parking lot and then entering the store.  Shortly thereafter, a grey van appeared and remained in the parking lot. This van subsequently parked next to Victim's vehicle when the space became vacant. The video depicts an individual exiting the driver side of the van, wearing a baseball cap and a reflective vest, who waited for Victim to return to his/her vehicle.  This individual then confronted Victim and put Victim into the van.

11.     Law enforcement obtained and viewed video surveillance from Victim's residence for the early morning hours of January 15, 2019.  The recording came from a camera in the

doorbell.  At approximately 2 o'clock a.m., the video depicts a man with a baseball cap and a headlamp around his neck.  This individual held a firearm in one hand.  The individual used a cellular device to illuminate the door handle.  A family member of Victim, who was not aware of the abduction, observed the individual approach the door and turned on the residence's lights.  The man outside fled without gaining entry.

12.     Law enforcement obtained and viewed security footage from the commercial establishment mentioned in Paragraph 4, where police found Victim bound in his/her car.  The video depicts a grey van pulling into the parking lot approximately two hours after the kidnapping. The van parked and an individual exited from the driver's side of the vehicle to speak with security guards at the commercial establishment.  The individual wore what appears to be blue jeans, a dark colored long sleeve top, and a baseball cap with a flag logo.

13.     Law enforcement recovered and viewed surveillance video from Victim's medical office.  In the days preceding his abduction, parking lot footage depicts a grey colored van parked in the lot for extended periods on multiple occasions.  The van appears similar to the van depicted on the retail store's surveillance footage mentioned in Paragraph 10.  The surveillance footage from outside of Victim's office also revealed the license plate number for the van as Florida tag number GHPT19.  Database checks revealed that a rental car company owns that van.

14.     Records from that rental company for the van with that license plate number demonstrate that Justin Boccio ("Boccio") rented the van on January 5, 2019, and returned it on January 15, 2019.[1]

15.     On the rental car agreement for the van, Boccio provided a cellular telephone number (hereinafter, "Phone 1").  Law enforcement confirmed, through database checks, that the

---

[1]     Boccio was charged via criminal complaint on April 2, 2019.  *See* 19-mj-02491-JB.

number for Phone 1 that Boccio provided on the rental agreement was also the phone number associated with Florida Power and Light utilities in Boccio's name.

16.     On February 7, 2019, law enforcement obtained and executed a federal search warrant for the historical cellular site information and call detail records pertaining to the telephone number associated with Phone 1 (Case No. 19-mj-02156-Torres).

17.     Cell-site records for Phone 1, obtained through the above-described warrant, revealed that Phone 1 was active and used near the car rental company mentioned in Paragraphs 14 and 15 on January 5, 2019, and January 15, 2019.  In addition, Phone 1 was active and utilized near the commercial establishment mentioned in Paragraph 4.  Phone 1 also called a telephone number registered to a taxi company.

18.     Law enforcement interviewed security personnel at the commercial establishment mentioned in Paragraph 4, and learned that the person in the security footage that approached the security guard requested a ride from the guard.  The individual advised that he would pay the security guard for the ride, but the guard declined.  The individual walked away from the establishment's entrance and back to the vicinity of the parking lot.

19.     Law enforcement subsequently obtained records from the taxi company referenced in Paragraph 17.  These records showed that the taxi company received a call from Phone 1 at approximately 8:54 p.m. on January 14, 2019, and listed Boccio by name as the caller.  The caller requested taxi service with a pick-up location matching the commercial establishment's address. The service was subsequently cancelled, and service was never performed.

20.     Cell-site records for Phone 1 reveal that Phone 1 was utilized near Victim's medical office on January 8, 2019, and January 10, 2019, which was during the time video footage captured a van in the medical office's parking lot as referenced in Paragraph 13.

## **Identification of Defendant NKORINA**

21.    A review of Phone 1 call detail records demonstrates that a second phone number (hereinafter, "Phone 2") called Phone 1 on January 15, 2019.  Records indicate that Phone 2 belongs to NKORINA.  Law enforcement compared a driver's license photograph of NKORINA (below, left) and video stills of the individual captured by the doorbell surveillance video mentioned in Paragraph 11 (below, right 1 and 2):



| Driver's License | Video Clip 1 | Video Clip 2 |

22.    Law enforcement also obtained and reviewed security camera footage from inside Victim's medical office on January 14, 2019 (the day of the kidnapping).  The video depicts a man entering the office at approximately 4:45 p.m. (two hours before the kidnapping).  The video further depicts this man appearing to fill out paperwork and using a cellular telephone.  Video footage shows Victim enter the area where the man is seated, and then the man abruptly stops using the cellular telephone, returns the paperwork, and leaves the office.  The individual depicted in the surveillance video appeared to be wearing blue jeans, a dark colored long sleeve top with rolled up sleeves, and a baseball cap with a flag logo, matching the attire of the person seen speaking to the security guard at the commercial establishment as described in Paragraph 12.  The appearance of the individual captured in the Victim's medical office video was consistent with that of Boccio.

23.     Records reveal that NKORINA shares a residence with Female 1.  Female 1 was a patient of Victim.  A public search of Facebook also indicates that Female 1 is "friends" with Boccio's wife.

24.     In addition to the information provided above relating to cell-site data, a review of the call detail records for Phone 1 indicates that between January 8, 2019, and January 16, 2019, Phone 1 had various telephone calls and text messages with the cellular telephone number belonging to NKORINA (Phone 2) and others between January 8 and 16, 2019, sometimes near Victim's medical office.

**The Search of Boccio's Residence and Subsequent Investigation on April 1, 2019**

25.     On April 1, 2019, law enforcement executed a search warrant at Boccio's residence. During the search, law enforcement recovered, among other things, reflective vests; a receipt from the retail establishment described in Paragraph 5, dated on or about January 14, 2019, *i.e.*, the date of the kidnapping; headlamps; and other evidence corroborating the Victim's account of, and Boccio's involvement in, the kidnapping.  Law enforcement recovered ammunition, but no firearms, during the search of Boccio's residence.

26.     Boccio was present during the search on April 1, 2019.  After law enforcement read Boccio his *Miranda* rights, he chose to waive them and provided voluntary statements to law enforcement.  During these statements, Boccio described how at some point in 2018, NKORINA moved in with Boccio.  Boccio identified an unmarked photograph of NKORINA as "Sergei." Boccio also confirmed that he knew Female 1 as Sergei's wife.

27.     According to Boccio, NKORINA proposed the kidnapping a short time after moving into Boccio's residence.  Thereafter, they began surveillance of Victim and executed the

kidnapping plot. Boccio described how he rented a van and utilized the van for surveillance and for the abduction. Boccio further stated that the reason for the kidnapping was to obtain money.

28.    In addition, Boccio described the location where Boccio and NKORINA tortured the Victim as being within a storage unit rented under Boccio's name. Boccio revealed the location of the storage unit as being Cube Smart in Margate, Florida. Boccio described how he helped set up the storage unit by wrapping it in plastic and bringing tools, a table, and a chair. Boccio added that he and NKORINA purchased the tools used at various Home Depot locations.

29.    Boccio also stated that he and NKORINA traveled to Victim's house after Victim revealed its location, and that during the trip to Vicitm's house, NKORINA was armed with two handguns. Boccio indicated that he and NKORINA returned to Victim's house on several occasions to attempt to gain entry, but never did so due to lights being on turned in the house and/or presence of a marked police car at Victim's residence.

30.    Continuing on April 1, 2019, law enforcement responded to Cube Smart in Margate, Florida, and learned, through questioning Cube Smart employees, that a storage unit had in fact been rented under Boccio's name, but that it was a short-term rental and that it had been vacated. Cube Smart maintains records of the dates on which its customers access its storage units by tracking when customer access codes are entered. According to Cube Smart records, Boccio last entered the access code for his storage unit on or about January 15, 2019. In addition, Boccio's storage unit rental expired on or about January 18, 2019. With the permission of Cube Smart employees, the storage unit previously rented by Boccio was examined and found to be empty.

31.    While investigating the storage unit rented by Boccio on April 1, 2019, law enforcement also asked Cube Smart employees whether NKORINA had rented any storage units at the same location. Cube Smart employees and records confirmed that NKORINA had rented a

8

unit in NKORINA's name.  Cube Smart records showed that NKORINA moved into Unit 22 on or about December 17, 2018, and that NKORINA had paid for the unit through April 16, 2019.  In addition, NKORINA's last access date for the unit was on or about February 21, 2019, *i.e.*, more than a month after the kidnapping.

32.     Cube Smart records further revealed that the address provided by NKORINA when he rented the storge unit was the address of Female 1.  The phone number provided by NKORINA to Cube Smart for the rental was the call number for Phone 2, discussed above.

33.     On April 1, 2019, law enforcement obtained a search warrant for the premises of NKORINA's storage unit at Cube Smart.  NKORINA's unit primarily contained furniture and did not immediately appear to contain further evidence related to the kidnapping plot.

## **CONCLUSION**

34.     Based on the foregoing, I respectfully submit that there is probable cause to believe that NKORINA committed violations of 18 U.S.C. § 1201(a) (kidnapping); 18 U.S.C. § 1201(c) (conspiracy to commit kidnapping); and 18 U.S.C. § 924(c) (using/carrying a firearm in furtherance of a crime of violence), as set forth herein.

FURTHER YOUR AFFIANT SAYETH NOT.

_____

JAMES KELLEY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this _3rd_ day of April, 2019.

_____

HON. JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE

9